**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                                                              Case No. 3:11-cr-147-J-32JRK

ANTHONY LEE LONG

_____

**ORDER**

This is a methamphetamine case tried non-jury where the sole issue is the drug weight for which the defendant will be held accountable. Specifically, has the government proven that the defendant manufactured or attempted to manufacture 50 grams or more of a mixture or substance containing a "detectable amount" of methamphetamine? The quantity of methamphetamine found within a mixture or substance and whether the entire mixture or substance should be included in the total weight for sentencing purposes are important because they determine here whether the five year minimum mandatory applies. 21 U.S.C. § 841(b)(1).[1]

The Court held an evidentiary hearing on December 18, 2012 (Doc. 73), the transcript

---

[1] A violation of § 841(a)(1) involving 50 grams or more of methamphetamine or 500 grams of a mixture or substance containing a detectable amount of methamphetamine requires imposition of a mandatory minimum penalty of not less than ten years imprisonment. 21 U.S.C. § 841(b)(1)(A)(viii). A violation of § 841(a)(1) involving at least 5 grams but less than 50 grams of methamphetamine, or at least 50 grams but less than 500 grams of a mixture or substance containing a detectable amount of methamphetamine, the quantity charged in the Indictment in this case, requires the imposition of a mandatory minimum penalty of not less than five years imprisonment. § 841(b)(1)(B)(viii). Where a defendant is adjudicated guilty based upon the finding of a quantity of less than 5 grams of methamphetamine, or less than 50 grams of a mixture or substance containing a detectable amount of methamphetamine, § 841(b)(1) does not provide for a mandatory minimum penalty.

of which is incorporated by reference. Based on the findings made at the evidentiary hearing, the Court conducted a non-jury trial on stipulated facts and on March 20, 2013 pronounced Defendant Anthony Lee Long guilty of knowingly and intentionally manufacturing and attempting to manufacture a mixture or substance containing a detectable amount of methamphetamine, the amount of the mixture and substance being less than 50 grams, in violation of Title 21, United States Code, Section 841(a)(1).[2] The transcript of the March 20, 2013 trial is incorporated by reference (Doc. 90).

In its March 29, 2013[3] Order Following Public Pronouncement of Verdict and Scheduling Sentencing (Doc. 84), the Court stated it would issue a written opinion further explaining its findings regarding drug weight as expressed in open court. This is that opinion. Sentencing commenced on June 27, 2013 and reconvened on July 2, 2013 where the Court pronounced sentence and has now entered judgment (Doc. 89).

At the evidentiary hearing, the government presented the testimony of two witnesses, DEA Special Agent Troy Eliason and DEA Chemist Deepa Vanmali. Doc. 73. Agent Eliason testifed that he was contacted by a Baker County Task Force Officer ("TFO") who advised him that officers had found a methamphetamine lab and needed help with the clean-up, and also that he was interested in possible federal prosecution. Id. at 16. Though Agent Eliason was not physically present at the scene, from photographs and information provided by TFOs he identified the lab as using the "one pot" method of cooking methamphetamine. Id.

---

[2] A lesser included offense to that charged in Count One of the Superseding Indictment.

[3] The Order is mistakenly dated March 29, 2012, but was actually entered on March 29, 2013.

at 16-18. Agent Eliason described the components necessary to manufacture methamphetamine using this method, how the chemical reactions occur, what yield and byproducts those processes typically produce, and how the post-reaction substances are commonly transported. Id. at 18-24. Agent Eliason also testified that a toxic bilayer solution is produced and identified the photographs of the pop bottle found at the scene as showing such a solution, with one-half consisting of a solvent layer from which additional methamphetamine could in some cases be extracted, and the other half "essentially waste byproduct." Id. at 26, 28, 29-30. However, the entire solution is toxic and if ingested would make a person sick. Id. at 27-28. The only "usable" product is the methamphetamine which is precipitated out and reduced to powder form. Id. at 28, 30.[4]

---

[4] At the hearing, the Court engaged in the following exchange:

THE COURT: So, sir, is it your testimony that what you likely had here was a bottle that had been used to make methamphetamine, but the – the usable methamphetamine had already been extracted?

[AGENT ELIASON]: One of two things happened. Either it was extracted, and that's what the remaining meth in the solution was, or it wasn't given enough time to manufacture the – the full amount of methamphetamine that was used. Without talking to the manufacturer and knowing how many pseudoephedrine pills were utilized, it's hard to tell. It's all in theory. But one of two things happened that way.

THE COURT: And when you say "manufacturer," you mean the person who was making the – attempting to make the drug?

THE WITNESS: Yes, sir.

THE COURT: Okay. Now, if it was the – if it was the second scenario, that is, that it – that the process had been interrupted so that it didn't mature, then that would be similar to the case we had with [another defendant]; is that correct?

THE WITNESS: Yes, sir.

THE COURT: Okay. So you're saying it either was that or it was that they finished making it, had already extracted it, and the bottle that law enforcement found was the leftovers?

THE WITNESS: Correct, sir.

THE COURT: Okay. And you can't tell which one without actually talking to the person who did it?

Additional testimony was elicited from the DEA chemist about the composition and purity of the solution collected from the pop bottle. Testing of those samples revealed a solution weighing 85.8 grams containing a detectable amount of methamphetamine at less than one percent of the composition. Id. at 36.[5] The chemist testified that it is DEA policy not to conduct further testing once it is revealed that a substance contains less than one percent methamphetamine, though further testing is possible and was requested by the government in this case. Id. at 36, 47-48. The additional testing revealed "the concentration of purity was 0.004 percent, and amount of actual drug was 0.0034 grams." Id. at 37. The chemist did not detect the presence of additional precursor chemicals, could not observe any ongoing chemical reactions, and had no information with which to estimate the yield of the pot or how much methamphetamine was attempted to be or was actually produced. Id.

So, of the entire substance, 0.004 percent of the bottom layer in the bilayer solution was methamphetamine. Id. at 55. The 0.004 percent calculation was generated with an "uncertainty number" of plus or minus 0.001 percent, meaning the detectable amount of methamphetamine could have been 0.003 or 0.005 percent of the solution. Id. at 60-61. The DEA chemist testified that there was no doubt that the 85.8 gram solution did contain a detectable amount of methamphetamine, and there was no possibility that the amount of methamphetamine could have actually been zero. Id. at 63-64.

---

THE WITNESS: Yes, sir.
Id. at 30-31.

[5] This 85.8 grams is the weight of only the solvent layer of the bilayer solution. The volume of the waste byproduct was not measured.

The Eleventh Circuit has not directly addressed whether a toxic byproduct of methamphetamine production is a "mixture containing a detectable amount of methamphetamine" within the meaning of the statute such that the entire solution must be included in calculating the total weight. There is a split of authority among other circuits that have addressed this issue: The law of the Fifth, Eighth, Ninth, and Tenth Circuits generally supports the government's broad view that the defendant should be held accountable for the entire weight of the solution notwithstanding that it was a toxic byproduct not ingestible or marketable, while the Sixth and Seventh Circuits have reached the opposite conclusion. All of the cases use as a point of departure the decision in Chapman v. United States, 500 U.S. 453, 460-61 (1991), in which the Supreme Court, relying on both the plain meaning of the statute and congressional intent to use a "market-oriented" approach, held that LSD combined with blotter paper, a common carrier medium, qualified as a "mixture" and therefore the paper should be included when determining the total weight.

In United States v. Kuentsler, 325 F.3d 1015 (8th Cir. 2003), the Eighth Circuit rejected the appellants' argument that "the liquid solutions in the lab were not mixtures or substances of methamphetamine within the meaning of the statute because they were unusable and unmarketable," determining that, although there was only 0.53 grams of usable methamphetamine, the entire 91.9 grams of unusable, toxic solution was properly included to support the defendants' convictions for conspiracy to produce 50 grams or more of methamphetamine. Id. at 1023. The court based its finding on both the plain language of the statute and its determination that waste products are necessarily part of the process of manufacturing methamphetamine, applying the market-based approach utilized by the

Supreme Court in Chapman. Id.

In United States v. Richards, the Tenth Circuit rejected the defendant's contention that it should join other circuits which have held that only usable or marketable portions of drug mixtures actually constitute "mixtures" for sentencing purposes, explaining that

> [a]pplying the plain meaning of "mixture," the methamphetamine and liquid by-products Defendant possessed constitute "two substances blended together so that the particles of one are diffused among the particles of the other." Liquid by-products containing methamphetamine therefore constitute a "mixture or substance containing a detectable amount of methamphetamine" for purposes of § 841(b).

87 F.3d 1152, 1157 (10th Cir. 1996)(citations omitted). The court continued

> [i]n essence, Defendant contends that it is fairest to sentence based only on the marketable or usable portions of drug mixtures defendants bring to the marketplace. Congress, however, did not adopt this approach. One searches in vain to find the words "marketable," "usable," or "consumable" in the plain language of § 841(a) or its legislative history. Congress did not enact these concepts into the statutory scheme . . . . Hence, as long as the defendant possesses the specified quantity of a "mixture or substance containing a detectable amount of" a controlled substance, Congress requires a mandatory minimum sentence. Such a broad sentencing scheme may result in sentencing disparities. Policy decisions, however, vest in the legislative branch, not the judicial . . . .

Id. at 1157-58. The Fifth and Ninth Circuits have similarly held. See United States v. Palacios-Molina, 7 F.3d 49, 53 (5th Cir. 1993)(determining waste byproducts may be included in total quantity determination because they are necessary to the manufacture and therefore ultimate distribution of methamphetamine, distinguishing them from "otherwise innocuous" liquids that may not be considered in total weight calculations); United States v. Beltran-Felix, 934 F.2d 1075 (9th Cir. 1991)(rejecting defendant's argument that the entire weight of a solution containing detectable amount of methamphetamine could not properly

6

be counted toward a drug quantity determination where the solution was not in a marketable form).

The Sixth and Seventh Circuits, however, have held that waste byproducts should not be factored into a total weight calculation of methamphetamine. The Sixth Circuit acknowledged that the plain language of the statute does appear to support the government's position and the views of some other circuits that waste product should be counted as part of the mixture, but held that such an interpretation would produce absurd and illogical results, as well as run contrary to the legislative intent underlying the statute. United States v. Jennings, 945 F.2d 129 (6th Cir. 1991). In making such a determination, that court explained

> both the government and the district court assumed that because the contents of the Crockpot contained a detectable amount of methamphetamine the entire weight of the mixture was appropriately considered for sentencing. Ordinarily, this would be a safe assumption. If, however, the "mixture" in the Crockpot contained a small amount of methamphetamine and poisonous by-products not intended for ingestion . . . this assumption is unwarranted. The uncontradicted testimony of the government's chemist established that, had the defendants been successful in completely reacting the chemicals in the Crockpot, they would have produced a much smaller amount of pure methamphetamine. It seems fortuitous, and unwarranted by the statute, to hold the defendants punishable for the entire weight of the mixture when they could have neither produced that amount of methamphetamine nor distributed the mixture containing methamphetamine.

Id. at 136. Applying Chapman's marketability analysis, the Sixth Circuit further noted

> [i]f the Crockpot contained only a small amount of methamphetamine mixed together with poisonous unreacted chemicals and by-products, there would have been no possibility that the mixture could be distributed to consumers. At this stage of the manufacturing process, the defendants were not attempting to increase the amount of methamphetamine they had available to sell by adding a dilutant, cutting agent, or carrier medium, but rather were attempting to distill methamphetamine from the otherwise uningestible

7

byproducts of its manufacture.

Id. at 137. Accordingly, that court stated that if the chemical properties were indeed revealed to be toxic, "it would be inappropriate for the district court to include the entire weight of the mixture for sentencing purposes." Id.

The Seventh Circuit similarly held that only usable or consumable mixtures of substances can be used in determining drug quantity for purposes of applying the mandatory minimum penalties under Section 841(b). United States v. Stewart, 361 F.3d 373 (7th Cir. 2004). Faced with a situation in which there were only 2.4 grams of actual methamphetamine present in a solution whose total weight was 825 grams, that court held "only the amount of pure drug contained in an unusable solution, or the amount of usable drug that is likely to be produced after that unusable solution is fully processed, may be included in the drug quantity under the statute." Id. at 382. The Seventh Circuit explained that it

> recognized that persons who possess solutions at an early stage of the manufacturing process, or waste product in its aftermath, are not attempting to increase the amount of [saleable] drug by adding a dilutant, cutting agent, or carrier medium, as was the concern in Chapman. The partially processed solution may tell us how much of a drug can be produced, and the waste might tell us how much was produced, but neither material is usable in that form. Consequently, rather than weighing everything, it would seem reasonable to include only the amount of usable or consumable substances, or the amount of drug that the defendant could have extracted from something that is unusable at the time of arrest.
> 
> As Stewart argues, weighing everything for sentencing purposes can lead to irrational results. We said as much in [United States v. Johnson,999 F.2d 1192 (7th Cir. 2004)], posing the hypothetical of a farmer plowing remnants of his marijuana crop into the topsoil or a defendant dumping drugs into the toilet and the sentencing court considering the earth in the field or the water in the toilet bowl as part of a mixture that should be weighed along with the drugs. We reasoned that such results would be contrary to legislative intent because Congress was concerned with mixtures that eventually will reach the streets. And while we thus agreed that cutting agents and dilutants can be

8

> factored into the weight calculation, we also concluded that substances which
> do not facilitate the distribution should not be counted because there is no
> rational basis to a sentence based on the entire weight of a useless mixture.

Id. at 378-79 (citations and quotation marks omitted). The court also noted

> [i]t is clear that if Stewart had completed processing the 825 grams of liquid
> into usable methamphetamine and discarded the waste before being caught,
> only the amount of finished product would be attributed to him for sentencing.
> Similarly, if Stewart had been caught with his raw materials before starting to
> manufacture the methamphetamine, only the amount of finished product that
> could be produced from the raw materials would have been attributed to him
> for sentencing. It would be illogical to include the entire weight of the 825-gram
> solution in the drug quantity–thus subjecting Stewart to a mandatory minimum
> sentence–merely because Stewart was caught after he had combined the raw
> materials, but before he had produced usable methamphetamine; to do so
> would reward defendants able to complete the manufacturing process without
> detection.

Id. at 381 (citations omitted).[6]

---

[6] Though many cases cited in this opinion are older, they all appear to remain good law in their respective circuits. See, e.g., United States v. Stewart, 361 F.3d 373, 382 (7th Cir. 2004)("[W]e reiterate our conclusion in [United States v. Johnson, 999 F.2d 1192 (7th Cir. 1993)] that only usable or consumable mixtures or substances can be used in determining drug quantity under § 841(b). Under this approach, only the amount of pure drug contained in an unusable solution, or the amount of usable drug that is likely to be produced after that unusable solution is fully processed, may be included in the drug quantity under the statute."); United States v. Treft, 447 F.3d 421, 422, 425 (5th Cir. 2006)(rejecting defendant's claim that the entire 4,128.2 grams solution was improperly included in the drug weight, noting "Treft gives us no reason why we should change our law, other than citing a Seventh Circuit case, United States v. Stewart, 361 F.3d 373, 377-80 (7th Cir. 2004), that conflicts with Fifth Circuit precedent. Absent an intervening Supreme Court or en banc decision or change in statutory law, we are bound to follow a prior panel's decision. Accordingly, we find that Treft's challenge to the calculation of the quantity of methamphetamine . . . must fail . . . ."(citations and footnote omitted)); United States v. Gentry, 555 F.3d 659, 666 (8th Cir. 2009)("Kuenstler is controlling precedent that we are not free to disregard in favor of decisions Gentry cites from other circuits which limit the relevant weight to the actual methamphetamine. . . . The solution that Gentry possessed was made up of a combination of chemicals that contained methamphetamine. Thus the full weight of the liquid in the pickle jar, 92.07 grams, may be counted for purposes of § 841 . . . ."). Another more recent case, United States v. Clarke, 564 F.3d 949, 955 (8th Cir. 2009), acknowledges the circuit split on

Though the Eleventh Circuit has not yet decided this precise issue, a review of its decisions in analogous cases suggests that the Eleventh Circuit would likely align itself with the Sixth and Seventh Circuits by finding that waste byproduct should not be included when calculating the total weight of a mixture containing a detectable amount of methamphetamine. Two Eleventh Circuit cases that guide this Court's decision are United States v. Rolande-Gabriel, 938 F.2d 1231 (11th Cir. 1991), and United States v. Newsome, 998 F.2d 1571 (11th Cir. 1993).

In Rolande-Gabriel, the Eleventh Circuit, in the context of determining a Sentencing Guidelines issue, addressed for the first time a mixture of a controlled substance and a carrier medium otherwise unusable and unmarketable to the consumer. 938 F.2d at 1234. The Court observed

> [t]he Sentencing Guidelines Statutory Mission and Policy Statement clearly and plainly indicate that the primary purpose of the guidelines system is to create a scheme of "uniform and rational" sentencing. In applying the term "mixture" to the facts of this case, we are faced with a conflict between the commission's comment indicating that the term "mixture" means the same as it does in 21 U.S.C. § 841, and the Sentencing Guidelines' well-documented purpose of rationality and uniformity in sentencing. If we strictly adhere to the committee's comment, then all mixtures are to be included, despite the fact that disparate and irrational sentences will result. If we read "mixture" in conjunction with the purposes behind the Sentencing Guidelines, then section 2D1.1 should be applied in a manner which creates the greatest degree of uniformity and rationality in sentencing. Faced with a choice between contradictory statements of intent and policy by the Guidelines Commission, we adopt the more rational alternative.

---

this issue and reaffirms that the decision in Kuenstler is still controlling in the Eighth Circuit such that "the total weight of the solution, not just the weight of the solid methamphetamine, should be counted under § 841." Id. (quotation marks omitted). Moreover, contrary to this case, in Clarke, there was expert testimony that liquid solvents could have been "converted to usable form." Id.

> The inclusion of the weight of unusable mixtures in the determination of sentences under section 2D1.1 leads to widely divergent sentences for conduct of relatively equal severity. In the present case, the appellant was sentenced based on a total weight of 241.6 grams, despite the fact that only 72 grams of the mixture constituted a usable or consumable drug mixture. This hyper-technical and mechanical application of the statutory language defeats the very purpose behind the Sentencing Guidelines and creates an absurdity in their application: the disparate and irrational sentencing arising out of a "rational and uniform" scheme of sentencing.

Id. at 1235 (citation omitted). The Eleventh Circuit explained that in Chapman the Supreme Court determined that "a plain meaning interpretation of 'mixture' does not create an irrational result in the context of LSD and standard carrier mediums; however, in the present case it would be irrational for the court to fail to distinguish between usable and unusable drug mixtures in applying Sentencing Guideline § 2D1.1." Id. at 1236.

The Court further distinguished the solution in Rolande-Gabriel from the blotter paper in Chapman, noting

> [t]he [Supreme] Court stated the inclusion of the weight of standard carrier mediums is rational because standard carrier mediums facilitate the use, marketing and access of LSD and other drugs. The liquid waste in this case, however, did not accomplish any of those purposes. The inclusion of the carrier medium of unusable liquid waste in this case for sentencing is irrational.
> The liquid found in Rolande-Gabriel's bags is similar to the "packaging" materials referred to by the Supreme Court in Chapman. The cocaine mixture in the present case was "easily distinguished from, and separated from" its liquid waste carrier medium. The government chemist easily distinguished the liquid from the drug powder and its cutting agent, characterizing it as "non-drug waste." Following extraction of the "waste" material, the chemist threw the liquid away.

Id. at 1237 (citation omitted). Ultimately, the Eleventh Circuit held that "the term 'mixture' in U.S.S.G. § 2D1.1 does not include unusable mixtures. This distinction is logical and rational, given the [ ] differences between mixtures which are usable and ones which are unusable."

11

Id. at 1238.

Similarly, in Newsome the Court was faced with whether its decision in Rolande-Gabriel applied equally where the solution in question was either a controlled substance in a pre-production state or a completely manufactured substance discarded as waste due to poor quality. 998 F.2d at 1576. The district court in Newsome included the entire weight of the mixture in its sentence calculation, despite the government's chemist's testimony that the substances were toxic, unusable, and contained less than one percent methamphetamine; the district court attempted to distinguish Rolande-Gabriel on the basis that the unusable mixture at issue in that case was a combination of a controlled substance and an unusable carrier medium, while the "yellow sludge" before the district court was "the product of an attempt to manufacture methamphetamine." Id. at 1578. The Eleventh Circuit rejected this distinction:

> In Rolande-Gabriel, . . . our focus was on the rationality of sentencing drug defendants based on unusable waste materials. As we explained, "it is fundamentally absurd to give an individual a more severe sentence for a mixture which is unusable and not ready for retail or wholesale distribution while persons with usable mixtures would receive far less severe sentences." Likewise, it makes no sense to sentence these defendants based on the weights of materials that would never find their way to methamphetamine consumers.
> . . .
> Because the sludge substances in this case were unusable, we find that the rationale of Rolande-Gabriel controls the disposition of this issue–<u>the gross weight of "unusable mixtures" should not be equated with the weight of a controlled substance for sentencing purposes</u>. We conclude that the district court's inclusion of the total weight of the two substances . . . was clear error.

Id. at 1578, 1579 (emphasis added)(citation omitted).

These cases suggest the Eleventh Circuit would likely hold that toxic waste

12

byproducts should not be considered in determining drug weight; this view is further buttressed by the contrasting Eleventh Circuit decision in United States v. Segura-Baltazar, 448 F.3d 1281 (11th Cir. 2006). In that case, the Court relied on Chapman to hold that a cutting agent commonly included with a drug when it is distributed or marketed should be counted when determining total weight, further distinguishing those types of materials from the formulations in Newsome, Rolande-Gabriel, and United States v. Jackson, 115 F.3d 843 (11th Cir. 1997)(a case in which the Court found that because the cocaine was not actually cut with the sugar, which was merely placed on top to make the purchaser think the entire substance was cocaine, the weight of the sugar should not be included in quantity determinations). Segura-Baltazar, 448 F.3d at 1293. The Eleventh Circuit in Segura-Baltazar determined that, because there was no dispute that the methamphetamine was mixed with a common cutting agent, and despite defendant's contention that the solution was too diluted to be marketable or usable, the district court properly considered the total weight of the methamphetamine plus the cutting agent to find that the government had met its burden of proving at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine. Id. The Eleventh Circuit's distinction between common cutting agents, platforms, or dilutants that should be included in determining the drug weight and toxic, unusable waste byproducts or sludge which should not be, informs the Court's decision in this case.

The Court is further persuaded by the pronouncement of the United States Sentencing Commission that parallels the line of demarcation drawn by the Sixth and Seventh Circuits, as well as the reasoning of the Eleventh Circuit in Rolande-Garbriel and

Newsome. Following the Supreme Court's decision in Chapman, the Sentencing Commission modified Sentencing Guideline § 2D1.1 to reflect the language of Amendment 484, which, in calculating drug quantity, distinguished between materials that could be easily separated from the controlled substance and those that could not. Describing the waste products addressed by the Amendment, the Sentencing Commission explained that

> [t]he waste product is typically water or chemicals used to either remove the impurities or form a precipitate (the precipitate, in some cases, being the controlled substance). Typically, a small amount of controlled substance remains in the waste water; often this amount is too small to quantify and is listed as a trace amount (no weight given) in DEA reports. In these types of cases, the waste product is not consumable.

Amendment 484, U.S. Sentencing Guidelines Manual app. C (1993). The relevant Guideline, as amended, provides that

> "[m]ixture or substance" as used in this guideline has the same meaning as in 21 U.S.C. § 841, except as expressly provided. Mixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used. Examples of such materials include the fiberglass in a cocaine/fiberglass bonded suitcase, beeswax in a cocaine/beeswax statue, and waste water from an illicit laboratory used to manufacture a controlled substance. If such material cannot readily be separated from the mixture or substance that appropriately is counted in the Drug Quantity Table, the court may use any reasonable method to approximate the weight of the mixture or substance to be counted.

U.S. Sentencing Guidelines Manual § 2D1.1, cmt. n.1 (2012)(emphasis added). Though not binding in the context of determining the meaning of the drug statute, the undersigned does find it persuasive that were the Court addressing the toxic, unusable waste product at issue in this case under the Guidelines, the weight of the waste product would not be counted toward the total drug weight calculation.

Had the evidence adduced at the trial established that there was a market for the type

14

of waste product at issue, that it was usable, or that it was a "cutting agent" or "common carrier" of methamphetamine, the result would likely be different. However, the undisputed testimony was that 85.8 grams of solution comprising the bottom layer of the bilayer solution contained 0.0034 grams of actual methamphetamine, at purity concentration of 0.004 percent. Doc. 73 at 37, 46, 48. Additional testimony revealed that the substance was toxic and unusable, and resulted from either a completed manufacturing process from which the usable methamphetamine had already been extracted or an attempt to produce methamphetamine that was thwarted prior to completion of the chemical processes. Doc. 73 at 29-31.

Faced with this evidence, and considering the Eleventh Circuit's decisions in Rolande-Gabriel and Newsome, the Eleventh Circuit would likely align itself with those circuits that hold that where, as here, the mixture or substance is merely an unusable toxic waste byproduct, the weight of that mixture or substance may not be included in the methamphetamine drug weight calculation.

By his own admission, defendant is guilty of the manufacture or attempted manufacture of methamphetamine; he has already served a 27 month sentence. However, on the facts of this case, the Court, sitting as the fact and law finder in this non-jury trial, finds that the government has failed to prove beyond a reasonable doubt that the weight of the mixture or substance containing a detectable amount of methamphetamine is 50 grams or more; the defendant is convicted of the lesser included offense under 21 U.S.C. § 841(b) and no minimum mandatory penalty applies.

**DONE AND ORDERED** at Jacksonville, Florida this 23rd day of July, 2013.

TIMOTHY J. CORRIGAN
United States District Judge

ab.
Copies:

Assistant United States Attorney (Corsmeier)
Bruce Parker Culbert